IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

FILED

June 26, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| JUDD'S INCORPORATED, | ) | COCKE CHANCERY |
| | ) | |
| Plaintiff/Appellee | ) | NO.  03A01-9801-CH-00002 |
| | ) | |
| v. | ) | HON. CHESTER RAINWATER, JR. |
| | ) | CHANCELLOR |
| | ) | |
| DORIS L. MUIR and husband | ) | |
| ALLAN T. MUIR, | ) | |
| | ) | |
| Defendants/Appellants | ) | |
| and | ) | |
| | ) | |
| HOLLADAY-TYLER PRINTING, | ) | |
| INC., | ) | AFFIRMED |
| | ) | AS MODIFIED and |
| Defendants/Appellees | ) | REMANDED |


Richard Baker, Knoxville, for Appellants, Doris L. Muir and Allan T. Muir.

James H. Ripley, Sevierville, for Appellee, Judd's Inc.

Edward H. Hamilton, Douglas S. Yates, Joseph P. Stapleton, Sevierville, for Appellee Holladay-Tyler Printing, Inc.


**O P I N I O N**

INMAN, Senior Judge

Muir Publishing Company, Ltd., Inc. [Muir Tennessee]. sitused in Cocke County, Tennessee, published a log home magazine.  After Muir Tennessee bankrupted, two of its creditors filed this action against Doris L. Muir, President and COO of the corporation, and her husband, Allan T. Muir, sole stockholder of the corporation, to recover substantial amounts owing to each creditor, alleging that the Muirs were personally liable under the *alter ego* doctrine and

that the corporate charter should be disregarded in order to onerate its President and sole shareholder with liability for the debts.[1]

The Chancellor held that the 'corporate veil should be pierced' because the Muirs engaged in an extended and extensive scheme to defraud creditors through manipulative corporate schemes. He made exhaustive findings of fact, with which we fully concur, and allowed a recovery against the Muirs. Pre-judgment interest and attorney fees were denied. The Muirs appeal, insisting that they cannot be held liable for the debts of the corporation. The creditors appeal from the disallowance of pre-judgment interest and attorney fees.

We affirm the judgment against the Muirs for the open accounts. The judgment is modified to allow pre-judgment interest as provided for by T.C.A. § 47-14-123 beginning December 1, 1993, as to each plaintiff, and the case is remanded to the trial Court for a determination and assessment of attorney fees, and for all other appropriate purposes.

Our review of the findings of fact made by the trial Court is *de novo* upon the record of the trial Court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. TENN. R. APP. P., RULE 13(d).. R. APP. P., RULE 13(d); *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26 (Tenn. 1996). Where there is no conflict in the evidence as to any material fact, the question on appeal is one of law, and the scope of review is *de novo* with no presumption of correctness accompanying a chancellor's conclusions of law. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87 (Tenn. 1993).

**I**

_____

[1]Holladay-Tyler, a cross-plaintiff, is treated as an original plaintiff in this opinion.

2

The defendants first published their log home magazine in 1977. Their company was incorporated in Canada as Muir Publishing Company, Ltd. ("Muir Canada"), of which they were the sole shareholders. Doris Muir was the president. It is not disputed that she and her husband exercised complete dominion and control over all the affairs of the corporation.

In 1985, Doris Muir negotiated a contract with the ICD Hearst Corporation ("Hearst") to distribute and collect revenue from newsstand sales of magazines produced by Muir Canada. The contract, which provided that all newsstand revenues would be paid to Muir Canada, was for a period of six years and terminated in 1991. In the interim, Muir Canada had incurred a heavy debt to its Canadian printer known as "Ronalds".

In 1987, the defendants obtained a Tennessee charter for Muir Publishing Company Limited, Inc. ("Muir Tennessee") and by 1990 they had transferred all publishing activities from Muir Canada to Muir Tennessee, although Muir Canada still owed its printer, Ronalds, approximately $400,000.00 in Canadian dollars. Notwithstanding this debt, Doris Muir directed that the revenues from Hearst which were owing to Muir Canada should be remitted to Muir Tennessee. In addition, she had Muir Tennessee assume the Muir Canada debt to Ronalds completely without consideration.

In the mid 1980's, the Muirs began accumulating a substantial amount of real estate in Cosby, Tennessee, title to which they took individually, notwithstanding that this real estate and a host of improvements were financed solely by Muir Tennessee and advertising credits to suppliers. When questioned as to whether he or his wife had paid any amount from their individual funds for the construction of any of the improvements upon the

3

property, Mr. Muir responded, "not that I can recall, no." In a magazine editorial he more expansively explained the extent to which he and his wife were enriched at the expense of Muir Tennessee. The editorial was ironically entitled "The Inside Story":

> "When we first started building the information center Bankers were not a problem. We had it nicely worked out that we could finance it entirely from the cash flow of *Log Home Guide*. By the time this cash flow loan from *Log Home Guide* reached a quarter of a million dollar investment, however, and Doris, stimulated by the sight of the Peace Chapel and the shell of the Center rising massively above the ground, had laid *more* plans for the acquisition of *new* land and *more* buildings, there were rumblings from our Banker in Canada. He had become aware of a vast transfer of funds from Canada to the United States, and quiet unreasonable [sic] from Doris's view point, wanted to know what was going on . . . Don't get me wrong. I have nothing against the Information Center being nonprofit. It is just that I didn't like the way *Log Home Guide* was becoming nonprofit too the way the cash was pouring out."

When asked to review this editorial for accuracy, he responded, "Yeah, I would say it's probably absolutely accurate."

In early 1990, the defendants contracted with the plaintiff Holladay-Tyler Publishing Company, Inc. ("Holladay-Tyler") to publish the magazines produced by Muir Tennessee. By late summer of 1993, Muir Tennessee was unable to pay its debt to Holladay-Tyler, which required the Muirs to sign a note agreeing to a payment schedule as a condition to a continued business relationship. Muir Tennessee made one $20,000.00 payment on the note before it defaulted and sought another printer. There was then owing to Holladay-Tyler $318,896.65 in principal debt exclusive of interest and attorney's fees.

Muir Tennessee then contracted with the plaintiff Judd's Incorporated ("Judd's) to print its publications. Beginning in October, 1993, Judd's agreement to print the magazines was based on a credit application provided to it and signed by the defendant, Doris Muir. Relying on this credit application,

4

Judd's printed magazines for Muir Tennessee which incurred an indebtedness to Judd's in the principal amount of $78,777.65.

In 1990, and during the accumulation of this debt, the defendants relocated to the Cayman Islands, where they formed another company, known as Muir's Original Inc. ("Muir Cayman"). As with Muir Tennessee, Allan Muir was the sole shareholder and Doris Muir was president of Muir Cayman.

In 1991, Muir Cayman began receiving checks from Muir Tennessee, twice monthly, for what the defendants called "consulting fees". These consulting fees initially were $10,000.00 per month and eventually increased to $15,000.00 per month. From 1991 through the end of fiscal year 1994, a total of $511,900.00 in such fees was paid to Muir Cayman by Muir Tennessee to the detriment of the creditors of Muir Tennessee who were not being paid.

When Holladay-Tyler realized that it was not going to be paid by Muir Tennessee for its printing services, it filed suit against Muir Tennessee, which impelled the defendants to take action to "protect their assets".[2] In furtherance of that goal, Doris Muir wrote to Hearst (the newsstand distributor) with instructions to remit all money from newsstand sales to Muir Cayman rather than Muir Tennessee even though Muir Tennessee had produced the magazines and was responsible for the debt incurred in producing the magazines.

This shifting of income was similar to the technique the Muirs had used with Hearst newsstand revenues when they moved their operations from Canada to Tennessee. During fiscal year 1994, Muir Cayman received a total of $331,000.00 in newsstand revenues for the sale of magazines for which Muir Tennessee remained obligated to pay the printing charges.

---

[2]Pronounced, as the briefs explain, by Mrs. Muir as 'ass-ets', a double *entendre* susceptible of a facile understanding.

In 1995, Muir Tennessee filed a petition in straight bankruptcy. Among the debts listed in the petition were the debt of Muir Canada to Ronalds, Muir Tennessee's debt to Holladay-Tyler, and its debt to Judd's. It is noteworthy that Judd's charges included the printing of the 1994 annual, spring, summer, and fall editions of *Log Home Guide,* even though the newsstand revenues for these issues were paid to Muir Cayman.

W. Edward Souther, a certified public accountant, investigated the financial dealings between Muir Tennessee and Muir Cayman, which revealed that between the fiscal years ending July 31, 1991 and July 31, 1994, a total of $511,900.00 for consulting fees transferred by Muir Tennessee to Muir Cayman. The siphoning of the funds of Muir Tennessee ultimately drained its net worth. Combined with Hearst newsstand sales paid Muir Cayman as opposed to Muir Tennessee, Muir Cayman received $843,000.00 from fiscal year-end 1991 through fiscal year-end 1994. In 1994 alone, the Muirs transferred, by consulting fees and Hearst payments, a total of $436,000.00 to Muir Cayman, resulting in a $241,100.00 net loss as opposed to, according to Mr. Souther, what would have been a $200,000.00 profit for that year.

**II**

It is well settled in Tennessee that the "corporate identity" will be disregarded where the evidence indicates that the corporation is a mere sham and observance of such corporate identity would work injustice. *Fidelity Trust Co. v. Service Laundry Co.,* 22 S.W.2d 6 (Tenn.1929); *Neese v. Fireman's Fund Insurance Co.,* 386 S.W.2d 918 (Tenn. App. 1964); *Oak Ridge Auto Repair Service v. City Finance Co.,* 425 S.W.2d 620 (Tenn. App. 1967); *Electric Power Board of Chattanooga v. St. Joseph Valley Structural Steel Corp.,* 691

S.W.2d 522 (Tenn. 1985); *Schlater v. Haynie,* 833 S.W.2d 919 (Tenn.App. 1991); *see also Anderson v. Durbin,* 740 S.W.2d 417 (Tenn. App. 1987) (corporate veil may be pierced and true owners held liable when corporation is liable for debt but is without funds due to some misconduct on the part of the owners/directors or officers); *Murroll Gesellschaft v. Tennessee Tape,* 908 S.W.2d 211 (Tenn. App. 1995) (in an appropriate case and in furtherance of the ends of justice, a corporation and individuals owning all its stock will be treated as identical).

In *Gesellschaft,* Jerry Teal was the sole owner of all the stock of two corporations, Tennessee Tape, Inc. ("TTI"), and Cellux Converters, Inc. ("CCI"). He exercised absolute and active control over the operations of both corporations. Murroll Gesellschaft shipped its particular product to TTI, which then sold that product to CCI, which in turn customized the product and sold it back to TTI.

In 1993, Gesellschaft shipped $124,877.24 worth of its product to TTI on credit. Shortly thereafter, Mr. Teal, the sole shareholder and director of both TTI and CCI, directed TTI to give CCI a $400,000.00 rebate which included transferring $325,000.00 worth of merchandise to CCI for "pretextual" consideration. This transfer rendered TTI unable to pay its creditors, one of which was the plaintiff. After the issuance of the rebate to CCI Mr. Teal ceased drawing a salary of $3,500.00 per month from TTI and increased his salary from CCI from $2,000.00 to $5,000.00. He argued the justification for this transfer was that Tennessee Tape had purchased merchandise from Cellux at prices that were too low and for which Cellux had paid too much. According to Teal,

Cellux was entitled to a "rebate" of $400,000.00, which was partially satisfied by the transfer of $325,000.00 worth of merchandise.

We held that the rebate was merely a "pretextual consideration", and that the shifting of funds from one corporation to another was relevant to the issue of piercing the corporate veil, stating:

> "The testimony of Jerry Teal shows unequivocally that he, as sole stockholder of Tennessee Tape, Inc., caused Tennessee Tape to transfer $325,000 in merchandise to Cellux Converter, Inc., his other solely owned corporation, with only pretextual consideration, thereby rendering Tennessee Tape, Inc. unable to pay its debts and enabling Cellux converters to more than double his (Teal's) salary.

> This dealing was clearly in fraud of the creditors of Tennessee Tape, Inc., and justified piercing the corporate veils to require both Teal and his other corporation to account to plaintiff for the fruits of the fraudulent conversion of assets."

*Gesellschaft* is instructive here because of the undisputed testimony of the defendant, Doris Muir, that she and her husband Allan Muir were the sole owners and controlling officers of Muir Canada, Muir Tennessee, and Muir Cayman, and exercised complete control and dominance over each of these corporations. Doris Muir testified that she, as president of all three corporations, had the authority to enter into, amend, and swap contracts between the three corporations and third parties without authority or direction from a board of directors or any document evidencing the agreement of one corporation to have its rights altered in favor of the other. It was also undisputed that the defendants used their control over Muir Tennessee and Muir Cayman to have Muir Tennessee pay "consulting fees" to Muir Cayman in excess of $500,000.00. Furthermore, Doris Muir testified that she used her control over Muir Tennessee and Muir Cayman to alter the distributing contract between Hearst and Muir Tennessee to direct a total of more than $300,000.00

8

in newsstand revenues to be sent to Muir Cayman with absolutely no consideration to Muir Tennessee. This was accomplished to the direct detriment of Muir Tennessee's creditors and for the correlative benefit of the defendants who were then living in the Cayman Islands.

The Muirs were unable to demonstrate a lawful justification for their decision to require Hearst to send funds in the amount of $331,200.00 to them in the Cayman Islands. Significantly, Doris Muir stated that this action was in response to the initiation of legal proceedings by Holladay-Tyler "to protect *our assets.*"

The Muirs argue that the consulting fees were earned while they lived in the Cayman Islands. This argument cannot withstand scrutiny, because Doris Muir admitted that they *were not actively involved* in the magazine from 1991 to 1993:

> " . . . I didn't have anything whatsoever to do with the editorial of the magazine. I didn't even read it when it came to Cayman. I didn't even read it I was so sick of the log home industry. Every issue in 1991 I didn't even look at."

> • • • • •

> "If the editor and the publisher of the magazine left and were at Cayman, somebody had to have authority here, so we took a secretary, an executive secretary, and made her publisher of the magazine because there wasn't anybody else to do it."

> • • • • •

> " . . . by 1993 when I had to fire John Leeper then I had to take over and I had to work on it, but I wasn't going to give up living in Cayman."

There can be no doubt that the consulting fees were corporate revenue out of which their printers should have been paid.

The defendants argue that the Chancellor erred in piercing the corporate veil because there was no evidence of an intent to defraud their creditors. We do not agree; the record reflects that the actions of the defendants were egregious to the extreme, and calculatedly so, in a blatant scheme to defraud the printers.

Revenues from the 1993 production were diverted to the Cayman Islands under the plan devised in 1990 and implemented in the summer of 1993. The Muirs' testimony clearly reveal that they disregarded the corporate charter solely to enrich themselves personally. This fraudulent intent is clearly shown by the evidence. Doris Muir, knowing that suit had been filed to collect a debt which she admitted was a valid obligation of Muir Tennessee, purposefully and willfully diverted its funds to another corporation solely owned, operated and controlled by her and her husband.

Gary Piper, a C.P.A. who had been employed by the Muirs, testified regarding the diversion of funds. He testified that the major source of income for the Tennessee corporation was newsstand revenue from Hearst, and that he became alarmed when Mrs. Muir was considering shifting the Hearst revenue from Muir Tennessee to the Muirs in Cayman Islands. Piper was asked by Mrs. Muir to call Hearst with instructions to make the change, but was not comfortable in doing so, because he believed that the shifting of this revenue would be detrimental to Muir Tennessee.

It is significant that the "consulting fees" paid from Muir Tennessee to Muir Cayman were substantially in excess of the combined salaries of the defendants when they were actually working for Muir Tennessee. Accountant Souther testified that his review of the financial statements of all three

corporations and the Muir's tax returns revealed that the defendants received combined salaries averaging $70,000.00 per year from 1988 - 1990, years in which they were actually working, while the consulting fees from 1991 - 1994 averaged $144,000.00 per year.

In summary, the record is replete with evidence that the defendants manipulated these corporations by transferring the debts of one to the other, diverting funds owed to one corporation to another, and changing the contractual rights of all three companies as they chose. Corporate action, as contrasted to individual action, was never taken. No corporate records were made.

We agree with the appellees that it is abundantly clear from the evidence that the defendants manipulated all three corporations as if none had any existence separate from them. When Doris Muir was asked about how the right to publish magazines and receive revenues was transferred between these corporations she testified, rather significantly:

> "I gave them the right in Canada, and I gave it to them in Tennessee, and my husband and I decided it was time to switch our corporate headquarters to Cayman. See, the thing you're not looking at counselor, is the fact that the owner of the magazine is sitting right over there [indicating Allan Muir], and what **he** produces **he** has the right to sell to anybody in the world, and **he's entitled** to the revenue as a result of what he produces."

Mr. Muir had a similar attitude. When asked why he was paid consulting fees by Muir Tennessee, he responded "because I own the company, and I was entitled to some **dividends** as a result of owning the company . . . my role as the owner of three companies seems to be well, who is he? Forget about him. That seems to be the attitude I'm getting from these lawyers here. They don't seem to think I'm entitled to any remuneration whatsoever."

11

The defendants' admission that the various corporations paid for their homes, telephones and swimming pools is additional stark evidence of the scheme apparent in this record. It is clear that these corporations were treated as mere shams for the sole benefit of the defendants to unlawfully enrich themselves at the expense of the creditors of the corporations.

**III**

Defendants argue that the Chancellor erred in sustaining an objection by the plaintiffs to the introduction in evidence of a data compilation prepared specifically for this litigation. They argue that the compilation of evidence should have been allowed into evidence under Rule 803(6) of the Tennessee Rules of Evidence, which allows business records as an exception to hearsay.

In order to meet the requirements of the rule, the record must be one made in the "regular practice of that business activity," and it must have been "kept in the course of a regularly conducted business activity." Tennessee Rules of Evidence 803(6). Thus, "an extraordinary report prepared for an irregular purpose, particularly when prepared with litigation in mind, may not be made in the regular course of business and may be inadmissible as a business record under 803(6)." Neil P. Cohen et al,, *Tennessee Law of Evidence,* § 803(6).5 (3rd ed. 1995).

The compilation sought to be entered into evidence failed to meet the requirements of the rule because it was produced specifically in preparation for litigation, not in the regular course of business. Moreover, Rule 803(6) requires that the complication must have been made "at or near the time" of the event. Since the compilation of records from 1991 to 1993 was made years after the fact, the Chancellor properly excluded it.

**IV**

The Chancellor denied pre-judgment interest because "the defendants have no such liability to the plaintiffs until the entry of judgment hereon." While it is true that the defendants had no liability until judgment was pronounced - a truism applicable to any litigation - we cannot agree that this principle precludes an award of interest in accordance with T.C.A. § 47-14-123.

The amount of the obligations was always certain. The defendants had the use, albeit unlawfully, of the funds. To allow them to escape the payment of interest would thwart the ends of justice, especially when their egregious conduct is considered; conversely, to deprive the judgment creditors of interest on their accounts would clearly be inequitable. We are not here dealing with an abuse of discretion in denying interest; we think the Chancellor merely utilized an erroneous basis for the disallowance of interest. *See, Newton v. Cox,* 954 S.W.2d 746 (Tenn. App. 1997). Accordingly, the judgments will be modified to allow interest at the statutory rate beginning December 1, 1993.

**V**

In a similar vein, we think attorney fees should have been awarded.

The Chancellor was clearly justified in disregarding the corporate charter to hold the defendants personally liable to the plaintiffs. As we have shown, the application Muir Tennessee submitted provided that "the applicant agrees to pay . . . reasonable attorney fees." This application was signed by Doris Muir, as President of Muir Tennessee; we know of no reason why, in light of the fact that the corporate shield is not available to the defendants, they should not be onerated with attorney fees pursuant to their agreement. *See, Childress v. Sullivan County Board of Education,* 771 S.W.2d 411 (Tenn. App. 1988).

With respect to Holladay-Tyler, as heretofore shown, the defendants executed a promissory note for the amount then owing, which was circa $250,000.00. They signed this note in their respective officer capacities, and it is thus merely recitative of a debt already evidenced by an open account. But, and somewhat ironically, the note, unlike the account, provided for attorney fees in the usual way, thus sealing the obligation of the defendants to pay the fees for the reasons above expressed.

## VI

The Chancellor assessed discretionary costs against the defendants for the expenses incurred by the plaintiff relative to the testimony of the witness Souther. The defendants claim that since they stipulated the dollar amounts, the testimony of Souther was unnecessary. We have read his testimony, and conclude that the purported stipulation falls far short of equation. The Chancellor did not abuse his discretion in awarding these costs. Rule 54, Tenn. R. Civ. Pro.

The judgment, as modified, is affirmed and the case is remanded for all appropriate purposes, including a determination of attorney fees incurred by the plaintiffs, for trial and appeal. Costs are assessed to the appellants, for which execution may issue, if necessary.

_____
William H. Inman, Senior Judge

CONCUR:

_____
Houston M. Goddard, Presiding Judge

14

_____

Charles D. Susano, Jr., Judge